# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MAT S. BAYSA,

      Plaintiff,

v.                               Case No. 8:17-cv-00434-T-02SPF

ROBERT GUALTIERI, in his official
Capacity as SHERIFF of the Pinellas
County Sheriff's Office, CHARLES REDINGER,
Individually and as Pinellas County Deputy,
STEPHANIE ARCHER, individually and as
Pinellas County Deputy Sheriff,

      Defendants.

_____/


## ORDER

This matter comes to the Court on cross-motions for summary judgment. Dkts. 43, 44, 45, 47. The action stems from an alleged use of excessive force by two deputies responding to an early morning call at a poker room in Pinellas County. Dkt. 23. In his Amended Complaint, Plaintiff Baysa alleges violations of his Fourth Amendment rights under 42 U.S.C. § 1983 against Deputies Charles Redinger and Stephanie Archer (hereinafter collectively "Deputies") and their employer, Robert Gualtieri in his official capacity as Sheriff of the Pinellas County Sheriff's Office (hereinafter "PCSO").[1] *Id.* Plaintiff also brings state law claims of

---

[1] The § 1983 claims against the Deputies feature alternative theories for excessive force during a lawful arrest (counts II and III) and false arrest and excessive force during an unlawful arrest (counts IV and V).

false arrest and imprisonment, battery, and assault against all three Defendants and malicious prosecution against the Deputies. *Id.*

For the following reasons, the Court GRANTS Defendants' Motions for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment.

## BACKGROUND

In the early morning of June 10, 2013, Plaintiff was playing cards at Derby Lane Poker Room in St. Petersburg, Florida. Dkt. 43-11 at 18, 43-8 at 33[2]. Plaintiff testified that, while there, he had two shots of Jägermeister and two beers, though one had spilled some of its contents. Dkt. 43-8 at 42.

Plaintiff claims that, upon Plaintiff winning, a security guard began to "bird-dog" or closely watch him at the card table. Dkt. 43-11 at 22. Though not deposed for this civil action, the security guard testified at Plaintiff's criminal trial that, when cashing out, Plaintiff reached his hand "over the top bar of the cashier window" and was causing a disturbance. Dkt. 43-5 at 48, 60. Plaintiff disputes this and maintains he instead gave the cashier a $9 tip. Dkt. 43-8 at 43. He then exited the card room and walked to a drive-through ramp from which he could see his car. *Id.* at 44. Plaintiff testified he started to go out, and then walked back in, raised his

---

The claim of excessive force during an unlawful arrest, however, is subsumed by the false arrest claim and is not discrete. *See Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000).

[2] On April 23, 2014, Plaintiff went to trial on criminal charges arising from his activity at Derby Lane in Case No. CTC13-13352MMANO, County Court of the Sixth Judicial Circuit of Florida, Pinellas County. Deputy Redinger included the trial transcript in full in his Motion for Summary Judgment. Dkt. 43-3 – 43-9.

voice, and accused the security guard of staring at him all night. Dkt. 43-11 at 25-26.

According to the security guard, however, after the disturbance at the cashier's box the guard confronted Plaintiff who was "belligerent and argumentative" and appeared to be "extremely intoxicated." Dkt. 43-5 at 49, 51. The security guard escorted Plaintiff, who was no longer permitted in the card room, outside the room. *Id.* at 51. Plaintiff reentered. *Id.* at 52, 43-11 at 25. The security guard once more ordered Plaintiff to leave, noting "he would no longer be permitted to wait on the ramp area, that he was going to have to go down to the ground or parking lot level." Dkt. 43-5 at 52.

The security guard estimated that he ordered Plaintiff to leave six times and, even when told police would be called, Plaintiff continued to argue in a raised voice. *Id.* at 52. Plaintiff acknowledges a confrontation at some point, testifying that the guard was "screaming profanities at him" and Plaintiff was "of course . . . giving it right back to him." Dkt. 43-11 at 27. Derby Lane staff called police to witness a trespass warning against Plaintiff. Dkt. 43-5 at 53.[3] In his deposition, Plaintiff fairly admits he was trespass-warned by the security guard: "He told me to stay away . . . He told me to go outside." Dkt. 43-11 at 32-34.

---

[3] The contents of this call were not included in summary judgment materials.

According to Plaintiff, when he had looked outside at the parking lot he noticed movement by his car, which frightened him. Dkt. 43-11 at 25, 27. At the criminal trial, Plaintiff testified he thought he was being set up for a DUI. Dkt. 43-8 at 64. Plaintiff called 911. Baysa Dep. Ex. 2.[4]

On the call it is clear Baysa is manic and sounds very intoxicated. *Id.* Throughout the conversation, Plaintiff shouts, uses obscenities, and speaks over the dispatcher; he is also overheard trying to persuade a departing patron of Derby Lane to assist him. *Id.* Plaintiff told the dispatcher that the security guard had a gun, *id.* 00:30, 04:24, was aggressive, *id.* 00:18, had threatened him and that Plaintiff felt in danger, *id.* 01:37. By the middle of the call Plaintiff is yelling in a fury, demanding the dispatcher to "bring the cops" and to take him home as he was in danger: "I want to get picked up and taken home." *Id.* 03:52.

Plaintiff informed the dispatcher one of the guards (presumably the security guard) told him "go home, go home," *id.* 00:12, and "go outside," *id.* 2:06, and "they told [him] stay away," *id.* 00:57. This suggests clearly Plaintiff was told to leave by Derby Lane security. Plaintiff further testified his words on this call also may have included ". . . me being banned." Dkt. 43:11 at 50. It is also very clear that Plaintiff was enraged at the security guard. He yelled that he wanted the guard arrested "for harassing me," and that "I came here to gamble. I played. F--- him.

_____

[4] Baysa's 911 call was included in summary judgment materials as an audio file. *Id.*

He thinks he's got the power trip because he works here. Do you hear me?" *Id*. at 40; s*ee also id.* at 87-88 (plaintiff agreed he had "a beef" with the security guard).

The Deputies arrived on the scene around 2:50 a.m. Dkt. 43-14 at 25. The security guard was standing outside with "at least four other security guard staff members." *Id.* at 26. Deputy Redinger spoke with the security guard who said that Plaintiff was "acting in a disorderly fashion" and that Derby Lane wanted to issue a trespass warning. *Id.* at 28. The security guard then repeated the warning to Plaintiff in the presence of Deputy Redinger. *Id.* Deputy Redinger attempted to reiterate the nature of the warning but, according to Deputy Redinger, Plaintiff would not listen to the warning and was belligerent, not responsive, and "giving various profanities," *id.* at 29, though "most of this anger and agitation was directed towards the [Derby Lane] staff," *id.* at 31. He appeared intoxicated. Dkt. 43-6 at 7. Plaintiff testified Deputy Redinger did give him trespass warnings that Plaintiff disputed, continuing to "try[] to make [his] point . . . to make an argument." Dkt. 43-11 at 60.

Deputy Redinger further stated that Plaintiff continued to "verbally be aggressive" with Derby Lane staff and pace back and forth; the second time he approached the security guard "[Plaintiff] was in an aggressive stance, shoulders back, chest out, bowing his chest up and you can see clenched fists." Dkt. 43-14 at 31. The third time, Deputy Redinger "felt there was an imminent issue where he

might strike [the security guard] now. That's when [Redinger] stepped in and tried to effect an arrest at that point." *Id.* at 32.

Plaintiff does not dispute that Deputy Redinger "walked over . . . and told [him] that, yes, they are going to issue a trespass . . . [Redinger] told [Plaintiff] to never come back over there again." Dkt. 43-11 at 60. According to Plaintiff, Deputy Redinger ended the conversation by saying "Don't come back here anymore. You're free to go." *Id.* at 61. Plaintiff then took a few steps away from Deputy Redinger. *Id*. at 62. Plaintiff testified at his criminal trial that while he walked away "someone grabbed [him] or – and [he] just fell head first . . . [t]hen after that, [he] felt [his] neck got twisted a little bit and that's it." Dkt. 43-8 at 51. The next thing he remembered is being "in the handcuffs in the back of the cruiser . . . ." *Id.* at 53.

In his deposition in this civil matter, Plaintiff first reiterated that his criminal trial testimony, with its limited statement of an assault, was true. Dkt. 43-11 at 10, 11, 15, 16. But upon being examined by his own attorney at his civil deposition, Plaintiff provided a different version. He testified that his memory had come back to him now and he recalled that he "[felt] punches and kicks all over [his] body" before passing out, *id.* at 14, and had concluded that he was choked, *id.* at 17, 152. Plaintiff's more recent testimony differed substantially and materially from his

criminal trial: There he did not testify that he was punched or kicked while on the ground or that he was choked.

According to Deputy Redinger, in contrast, Deputy Redinger grabbed Plaintiff's wrists to restrain him at which point Plaintiff "brace[d] up . . . and tr[ied] to pull away from [Redinger]." Dkt. 43-14 at 36. Deputy Redinger then pushed Plaintiff against the side of his patrol car to prevent Plaintiff's movement. *Id.* at 37. Plaintiff broke free and tried to turn, so Deputy Redinger used a "hurried," "modified" takedown by bringing his left arm across Plaintiff's chest in a diagonal position and continuing to hold onto Plaintiff's other hand with his right arm. *Id.* at 39. The left arm or inside of the elbow may have been pressing against Plaintiff's neck. *Id.* at 42, 48; Dkt. 43-5 at 56 (the security guard testified Deputy Redinger "had to grab [Plaintiff] by his shoulders, about his neck, and they struggled").

Plaintiff fell face first onto the asphalt pavement with Deputy Redinger on top of him. Dkt. 43-14 at 40. Deputy Redinger's arm was trapped under Plaintiff and may have been applying pressure to Plaintiff's neck. *Id.* at 43. To pull Plaintiff's arms out from under him for handcuffing, Deputy Redinger used two "palm heel strikes," an open hand where the "striking area is the heel of your palm," "somewhere from [Plaintiff's] shoulder to waistline." *Id.* Deputy Redinger

eventually pulled Plaintiff's hands free. *Id.* at 44. The security guard and perhaps Deputy Archer then assisted with the handcuffs. Dkt. 43-5 at 56.

Deputy Redinger did not know the location of Deputy Archer during the arrest prior to handcuffing. Dkt. 43-14 at 36, 38, 41. In her deposition, Deputy Archer did not recall much about the arrest, though she stated that she has never seen a deputy use a chokehold, including during the arrest of Plaintiff. Dkt. 43-10 at 22. Plaintiff testified he had no knowledge of Archer using force upon him. Dkt. 41-11 at 135. Deputy Archer did not take statements and was not called as a witness at Plaintiff's criminal trial. Dkt. 43-10 at 19, 27.

After handcuffing Plaintiff, Deputy Redinger escorted him to the back of Deputy Redinger's patrol car and took him to the police station. Dkt. 43-14 at 49, Dkt. 43-10 at 24. During the ride Plaintiff and Deputy Redinger spoke in normal conversational tones, Baysa's Dep. Ex. 3[5], and Plaintiff agrees they had a calm, "casual" conversation. Dkt. 43-14 at 81. Plaintiff said in the car that he was good with people and that the security guard gave him a bad night. *Id.* at 88; Baysa Dep. Ex. 3 at 3:08. At no point during the conversation does Plaintiff talk about being hurt or choked or ask to go to the hospital. Dkt. 43-14 at 98.

---

[5] The dashboard cam video, which faced outside the patrol car, was included in summary judgment materials. Baysa Dep. Ex. 3. Notwithstanding the poor audio quality, it is possible to make out the conversation, which Defendants' counsel walked Plaintiff through during his deposition. The audible section of the conversation lasts for about six minutes from around 01:00 to 07:00.

At the jail, Plaintiff was seen by a nurse and received a bag of ice for his injuries. Dkt. 43-9 at 2. After leaving jail, Plaintiff stopped for cigarettes and Gatorade and went to his sister's house. Dkt. 43-11 at 98. Later that day, he went to Tampa General Hospital to seek treatment. *Id.* at 109.

A hospital report from the instant incident[6] states Plaintiff was "complaining [of a] slash of forehead. Neck, left rib and right elbow pain," "denies visual problems" and notes "[Plaintiff's sclera] is red and slightly swollen. Mid-facial swelling noted in forehead in orbital area. No [loss of consciousness]." *Id.* at 123-24; Dkt. 48-2 at 12. The medical report further observed "Bowing of the left medial orbital wall which appears discontiguous in some portions and may represent a small fracture, however this may also represent a congenitally thin lamina papyracea with variant appearance." Dkt. 48-2 at 3. This possible fracture was in any event not acute and needed "no intervention." Dkt. 43-11 at 124-25. Plaintiff was ultimately diagnosed with "facial contusion, eye contusion, subconjunctival hemorrhage, elbow abrasion, abrasions of multiple sites, headache, and rib contusion." Dkt. 48-2 at 4. There is no mention in the report of bruising around his neck or choking.

---

[6] Plaintiff was no stranger to Tampa General, and had sought medical treatment there the year before. Dkt. 43-11 at 110. In that incident, he appeared at 2:00 a.m. seeking medical help when, while drinking, a colleague had punched him three to four times in the left eye area, giving him a swollen eye and conjunctival hemorrhage and causing him to spit blood. *Id.* at 117-21.

Plaintiff was discharged from the hospital the same day and never sought treatment afterwards or had subsequent issues. Dkt. 43-11 at 125-26. Photographs of Plaintiff following the incident do show redness on the neck and a swollen eye area. Dkt. 48-4.

Plaintiff was arrested on misdemeanor counts of disorderly conduct in an establishment and resisting arrest without violence. Dkt. 43-13 at 7. The State Attorney's Office for the Sixth Judicial Circuit of Florida later amended the disorderly conduct charge to trespass. Dkt. 43-9 at 55. A jury acquitted Plaintiff of both trespass and resisting arrest without violence. *Id.* at 70.

Plaintiff filed his Complaint more than three years later on February 21, 2017. Dkt. 1. All motions for summary judgment were filed on September 7, 2018. Dkts. 43, 44, 45, 47.

## SUMMARY JUDGMENT STANDARD

Under Rule 56, Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.,* 93 F. 3d 739, 742 (11th Cir. 1996). If met, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F. 3d 1093, 1098 (11th Cir. 2018).

"A fact is 'material' if it has the potential of 'affect[ing] the outcome of the case.'" *Id.* And, to raise a genuine "dispute," the nonmovant must point to enough evidence that "a reasonable jury could return a verdict for [him]." *Id.* (modification in original). The Eleventh Circuit further teaches that "[w]hen considering the record on summary judgment 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Id.* (citations omitted).

## DISCUSSION

Because the disposition of Plaintiff's § 1983 claim against the Deputies will resolve the remaining claims, the Court turns to it first. Section 1983 requires a plaintiff to prove that (1) the defendants' conduct violated a constitutional right, and (2) the challenged conduct was committed "under the color of state law." *Melton v. Abston,* 841 F.3d 1207, 1220 (11th Cir. 2016).

In response, Defendants invoke qualified immunity, which protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citations omitted). Plaintiff does not seem to dispute that in deciding to arrest Plaintiff at Derby Lane the Deputies were acting within the scope of their discretionary authority. *See Bates v. Harvey*, 518 F.3d 1233, 1242 (11th Cir. 2008).

Thus, to overcome the Deputies' qualified immunity Plaintiff must show that (1) the Deputies' conduct violated a constitutional right, and (2) the right was clearly established at the time of the Deputies' alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson*, 555 U.S. at 236 (2009) (courts free to address inquiry in most appropriate order).

Plaintiff alleges that both the decision to and manner of arrest violated his Fourth Amendment rights, so the Court must determine whether the Deputies had probable cause to arrest Plaintiff and whether they acted reasonably during the arrest. *See Lee v. Ferraro*, 284 F.3d 1188, 1194-98 (11th Cir. 2002) (citations omitted). Because the Deputies both had probable cause and acted reasonably there was no constitutional violation. In the absence of a violation, Plaintiff's § 1983 claim against PCSO and the state law claims also fail.

I.    The Deputies had probable cause to arrest Plaintiff for trespass.

Probable cause to arrest "exists when the totality of the facts and circumstances support a reasonable belief that the suspect had committed or was committing a crime." *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007 (citations and quotation marks omitted). This "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 245 n. 13 (1983); *see also Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (citations omitted) ("[P]robable

cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.").[7]

Importantly, an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). It is thus of no import that the Deputies arrested Plaintiff on disorderly conduct in an establishment and resisting arrest without violence or that state prosecutors later amended the disorderly charge to trespass. Similarly, whether Deputy Redinger ultimately decided to arrest Plaintiff because he was uncooperative with the trespass warning or moving towards the security guard in a fighting stance does not weigh into a probable cause analysis.

Rather, the facts as known to the Deputies were sufficient to find probable cause for trespass. As defined by Florida statute, someone "who, without being authorized, licensed, or invited, willfully enters upon or remains in any property other than a structure or conveyance [a]s to which notice against entering or remaining is given . . . by actual communication . . . commits the offense of trespass . . . ." Fla. Stat. § 810.09(1)(a). An order to leave can be "personally communicated to the offender by the owner of the premises or by an authorized person." Fla. Stat. § 810.09(1)(b); *see also Smith v. State,* 778 So. 2d 329, 331 (Fla.

---

[7] This threshold, of course, is significantly lower than the beyond a reasonable doubt standard of evidence at a criminal trial. The jury's eventual acquittal of Plaintiff is therefore irrelevant in determining whether probable cause existed at the time of arrest.

2d DCA 2000) ("[W]hen an invitation has been extended to enter an open business . . . actual communication is necessary to put a person on notice that he is no longer welcome on the property and may be arrested for trespass.").

To this end, the Deputies were "entitled to rely on allegations of an informant and corroborating evidence" to find probable cause for trespass. *See Case v. Eslinger*, 555 F.3d 1317, 1327 (11th Cir. 2009) (citations omitted).

The record shows the security guard personally communicated to Plaintiff multiple orders to leave Derby Lane.[8] Each was ignored. Indeed, Plaintiff's own words on the 911 make this fairly clear. Plaintiff himself also testified that he was angry, yelling, and departed to the ramp area adjacent to the parking lot and then returned inside the premises. There he accused the security guard of trying to "set him up."

The Deputies responded to a call to witness a trespass warning. Deputy Redinger spoke with the security guard who stated that Plaintiff was "acting in a disorderly fashion" and that Derby Lane wanted to issue a trespass warning.[9] Having communicated the orders himself, the security guard had personal knowledge of the alleged criminal conduct. *See Daniels v. City of Hartford, Ala.*, 645 F. Supp. 2d 1036, 1054 (M.D. Ala. 2009) (finding that personal knowledge

---

[8] Though Plaintiff challenged the security guard's authorization to issue an order to leave at the criminal trial, *see e.g.*, Dkt. 43-3 at 23, there is no such argument here.

[9] It is worth noting the fact that this information was relayed to Plaintiff is undisputed, though its underlying veracity may be.

bolsters an informant's tip). The security guard's identity was, moreover, readily ascertainable and he was present when Deputies arrived on the scene.

The security guard then repeated the trespass warning to Plaintiff in at least Deputy Redinger's presence. Deputy Redinger testified he attempted to reiterate to Plaintiff the nature of the warning but, according to Deputy Redinger, Plaintiff was unresponsive, belligerent, and "giving various profanities." Plaintiff testified in his deposition that the Deputy instructed him to leave and Plaintiff disputed. By his own admission, Plaintiff continued to "try[] to make [his] point . . . to make an argument" in defiance of the Deputy's trespass warning.[10]

In short, after being asked repeatedly to leave, Plaintiff would not. First, fearing a DUI setup, in a manic rant he demanded the 911 operator to send someone to take him home. Then, when the Deputies arrived, he disputed the trespass instructions.

Having found probable cause for trespass based on the undisputed facts, the Court deems it unnecessary to determine whether probable cause existed for some other offense, whether arguable probable cause existed, *see Case*, 555 F.3d at 1327 (existence of arguable probable cause shields officer from false arrest liability

---

[10] The prior warnings of Derby Lane staff and Plaintiff's return to and refusal to leave the premises distinguish this case from others like *Gestewitz v. State*, 34 So. 3d 832, 835 (Fla. 4th DCA 2010) (finding that in the absence of reasonable suspicion officers lacked authority to detain an individual to issue a trespass warning). Indeed, whether the encounter between Plaintiff and the Deputies is characterized as consensual or a detention, the Deputies nonetheless had sufficient suspicion to arrest. *See id.* at 834 (police can only arrest for trespass if "owner or his agent first warned the potential trespasser").

through "clearly established" prong of qualified immunity), or whether other defenses such as immunity pursuant to Fla. Stat. § 509.143(3) apply.

This finding, moreover, is an "absolute bar" to Plaintiff's § 1983 false arrest claim, *see Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998), as well as the state law malicious prosecution and false arrest and imprisonment claims, *see Fischer v. Debrincat,* 169 So. 3d 1204, 1206 (Fla. 4th DCA 2015) (requiring "absence of probable cause for the original proceeding" for malicious prosecution); *Johnson v. Barnes* & *Noble Booksellers, Inc.,* 437 F.3d 1112, 1116 (11th Cir. 2006) (noting that Florida false imprisonment requires detention to be unlawful); *Willingham v. City of Orlando*, 929 So. 2d 43, 48 (Fla. 5th DCA 2006) (observing that probable cause is affirmative defense to false arrest).[11]

II.     The Deputies acted reasonably in their lawful arrest of Plaintiff.

To not run afoul of the Fourth Amendment during a lawful arrest, officers must behave "reasonably in the light of the circumstances before them," and any force used must be "reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger of the officer, and the flight of risk." *Galvez v. Bruce*, 552 F.3d 1238, 1243 (11th Cir. 2008) (citations omitted). Courts should also consider the relationship between the need and amount of force used and the extent of the injury inflicted. *Leslie v. Ingram,* 786 F.2d 1533, 1536

---

[11] There are cases where the existence of probable cause by itself seems to defeat battery claims as well, *see e.g., Sada v. City of Altamonte Springs*, 434 F. App'x 845, 851 (11th Cir. 2011), but the Court finds that additional analysis is necessary to determine whether the force used was reasonable given the circumstances.

(11th Cir. 1986). This is an objective inquiry. *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1354 (11th Cir. 2015) (citations omitted).

To begin with, the alleged criminal activity that Deputies were investigating was not severe. *See* Fla. Stat. § 810.09(2)(a) (trespass is a misdemeanor of the first degree); Fla. Stat. § 877.03 (disorderly conduct is a misdemeanor of the second degree).

Notwithstanding the mild nature of the crime alleged and the absence of a flight risk, Plaintiff was plainly drunk and disputatious. Deputy Redinger stated that during the encounter Plaintiff was "verbally aggressive" with Derby Lane staff and paced back and forth. Additionally, on multiple occasions Deputy Redinger observed Defendant to be in an aggressive stance with clenched fists. The 911 call and Plaintiff's state of mind on it affirm this view and belie his own claims that he was "calm" during the exchange with the Deputies. Dkt. 43-8 at 71-72. Deputy Redinger "felt there was an imminent issue where he might strike [the security guard] now. That's when [Redinger] stepped in and tried to effect an arrest at that point."

Taking all supported facts and reasonable inferences in Plaintiff's favor demonstrates that Deputy Redinger acted reasonably in his arrest of Plaintiff. Plaintiff continued to ignore the repeated notices of trespass. Deputy Redinger ultimately decided to arrest and was met with some resistance (even if it was a

natural reaction, *see* Dkt. 43-6 at 24). Deputy Redinger then seems to have applied as much force as necessary to subdue Plaintiff and, upon handcuffing Plaintiff, he immediately ceased the use of force. It is unfortunate that both parties fell to the asphalt, especially with Deputy Redinger's body on top of Plaintiff, but it was this contact with the ground that caused Plaintiff's injuries. The injuries were also relatively minor and did not require medical treatment or follow-up after the hospital visit: Basically Plaintiff got asphalt scrapes and a bad black eye.

There is no support in the summary judgment materials apart from Plaintiff's later uncorroborated deposition that Deputy Redinger took Plaintiff to the ground without first attempting to restrain his hands, kicked him while he was down, or put him in a chokehold. In fact, Plaintiff's deposition is materially refuted by his own testimony at trial: There are discrepancies on whether or to what extent—and when—he lost consciousness, whether he was choked, whether he jerked his arm in response to Deputy Redinger grabbing him or was simply taken to the ground, his reasons for not walking to his car, whether he stayed on the scene after the warning to explain himself to Deputy Redinger, and, based on the 911 call, whether he was told to leave.

A party "cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity."

*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *accord Van. T. Junkins & Assoc., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

Plaintiff's attempts to explain these material disparities are unavailing. He testified in his later deposition that only long after the incident did he conclude that he had been choked. As for the punching and kicking on the ground, Plaintiff stated without elaboration that the prosecutor merely "didn't ask about that. She wasn't very specific with her questions." Dkt. 43-11 at 14. But then he admitted that his answer was the same with no mention of punching or kicking when examined by his own counsel at trial. *Id.* at 15, Dkt. 43-8 at 53.

Plaintiff's testimony markedly changed from his criminal trial to his deposition, when questioned by his present civil counsel. Plaintiff's latter testimony conflicts with his earlier version and requires that he found a recovered memory.

The Court is unpersuaded. Deputy Redinger acknowledges that he may have applied some pressure to Plaintiff's neck during the takedown and ensuing struggle and that he administered two palm-heel strikes; Deputy Archer testified she had

never seen Deputy Redinger chokehold a suspect; the security guard testified Deputy Redinger "had to grab [Plaintiff] by his shoulders, about his neck, and they struggled."

Plaintiff's largely undisputed behavior—along with Deputy Redinger's response to that behavior—is reminiscent of *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004). Detained on a minor traffic violation, the plaintiff in that case refused at least five orders to retrieve documents, used profanity, "moved around and paced in agitation," and yelled at the officer. 369 F.3d at 1277-78. Faced with the tense circumstances, the officer in *Draper*, like Redinger, initiated an arrest without a "verbal arrest command." *Id.* Furthermore, the plaintiff was "standing up, handcuffed, and coherent shortly after" the use of the taser. *Id.* The United States Court of Appeals for the Eleventh Circuit upheld summary judgment for the officer. *Id.* at 1272-73.

Similarly, in *Lewis v. City of W. Palm Beach*, 561 F.3d 1288 (11th Cir. 2009), officers "maneuvered [the plaintiff] to the ground," placed a knee on his upper back and neck during the handcuffing process, and later restrained his legs and attached the leg restraints to the handcuffs. 561 F.3d at 1290-92. The appellate court upheld the application of qualified immunity at summary judgment. *Id.* at 1292; *see also Nolin v. Isbell*, 207 F.3d 1253 (11th Cir. 2000) (finding force de minimis where officers grabbed suspect, shoved him a few feet against a vehicle,

pushed a knee into his back and his head against the vehicle, and searched his groin in an uncomfortable manner); *Woodruff v. City of Trussville*, 434 F. App'x 852, 853, 855 (11th Cir. 2011) (per curiam) (officer punched suspect in the face, forcefully removed him from his car, and slammed him on the ground); *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003) (officer forced suspect to the ground); *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997) (per curiam) (officer "slammed" suspect against a wall and kicked his legs apart).

Even some chokeholds against resisting suspects have been deemed nonactionable. *See e.g.*, *Marantes v. Miami-Dade County*, 649 F. App'x 665, 670 (11th Cir. 2016) (officer knocked suspect to the ground and used chokehold); *Gomez v. United States*, 601 F. App'x 841, 851 (11th Cir. 2015) (officer grabbed suspect by neck, choked him, and slammed him against a vehicle before handcuffing); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559-60 (11th Cir. 1993) (chokehold of about five seconds).

The above line of cases, along with the instant case, is distinct from another set where police applied force to completely passive or compliant suspects. *See e.g., Scott v. Battle*, 688 F. App'x 674, 679 (11th Cir. 2017); *Smith v. Mattox,* 127 F.3d 1416 (11th Cir. 1997); *Saunders v. Duke*, 766 F.3d 1262, 1267 (11th Cir. 2014); *Lee v.*, 284 F.3d 1188; *Priester v. City of Riviera Beach,* 208 F.3d 919 (11th Cir. 2000).

The Court acknowledges some dispute as to the precise nature of the facts. The Court is equally mindful, however, that the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and that "mere conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported motion for summary judgment." *Hutchinson v. City of St. Petersburg*, No. 8:05-cv-833-T-30TGW, 2006 WL 2789010, at *3 (M.D. Fla. Sept. 26, 2006) (citations omitted); *see also Brown v. City of Clewiston*, 848 F.2d 1534, 1541 n. 12 (11th Cir. 1988) (listing cases upheld on summary judgment where courts to some extent analyzed evidence). Here the prime conflict in the evidence is between Plaintiff on the witness stand and Plaintiff in the civil deposition chair.

It is no doubt a balancing act for a court to consider whether evidence gives rise to a dispute at summary judgment, careful on the one hand to avoid intruding into the purview of the factfinder and on the other to stop cases from proceeding unnecessarily—or improperly—to trial. But the Court is convinced that given the materials before it here no reasonable jury could find in favor of Plaintiff.

To summarize, the Deputies' reasonable behavior and use of force during the arrest of Plaintiff did not violate his Fourth Amendment rights. In the absence of a constitutional violation, it is unnecessary to determine whether any such rule

was clearly established and, as such, the remaining § 1983 claim against the Deputies fails. Likewise, the assault and battery claims cannot succeed. *See City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996) (citations omitted) (officer is liable for battery only where force used during arrest is "clearly excessive"); *Sullivan v. Atl. Fed. Sav. & Loan Ass'n.*, 454 So. 2d 52, 54 (Fla. 4th DCA 1984) ("An assault is an intentional, *unlawful* offer of corporal injury to another by force.") (emphasis added).

III.  In the absence of a constitutional violation, Defendant PCSO is not liable under § 1983.

Plaintiff also brings a § 1983 claim against Sheriff Gualtieri under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Because Plaintiff sues Sheriff Gualtieri in his official capacity, the claim is effectively against the PCSO. *Penley v. Eslinger*, 605 F.3d 843, 854 (11th Cir. 2010). To prevail under *Monell*, Plaintiff must show that (1) his constitutional rights were violated, (2) the municipality had a custom or policy that constituted deliberate indifference to that constitutional right, and (3) the policy or custom caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citations omitted).

As noted above, Plaintiff suffered no violation of his constitutional rights. The claim falls short on this basis alone and it is unnecessary to delve into the materials concerning the PCSO's policies, including use of force, provided by Defendants.

**CONCLUSION**

The Court GRANTS Defendants' Motions for Summary Judgment. The Court DENIES Plaintiff's Motion for Summary Judgment. The Clerk is ordered to enter judgment for Defendants and close the case.

**DONE AND ORDERED** at Tampa, Florida, on October 24, 2018.

_____/s/ *William F. Jung*_____
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record