UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MAT S. BAYSA,

    Plaintiff,

v.                                                         CASE NO. 8:17-cv-434-T-02SPF

ROBERT GUALTIERI, in his official
capacity as Sheriff of the Pinellas County
Sheriff's office, CHARLES REDINGER,
and STEPHANIE ARCHER,

    Defendants.
_____/

## **ORDER ON RENEWED MOTIONS FOR SUMMARY JUDGMENT BY ARCHER AND REDINGER**

This matter comes before the Court upon Stephanie Archer and Charles Redinger's renewed motions for summary judgment. Dkts. 43, 45, 95, 98.[1] The Plaintiff has filed a response. Dkts. 96, 97, 100.[2] The Court grants Archer's motion for summary judgment and denies Redinger's.

The Eleventh Circuit affirmed in part and reversed in part the prior summary judgment order. Dkt. 88. Remaining in this case after remand is Count I, Plaintiff's action against the Sheriff under *Monell v. Dep't of Soc. Servs. of City of*

---

[1] These docket entries include the original two motions for summary judgment at dockets 43 and 45, in addition to renewed submissions at docket 95 and a reply to Plaintiff's opposition (Dkts. 96, 97) at docket 98.
[2] These docket entries are Plaintiff's submissions to the renewed motions.

*New York*, 436 U.S. 658 (1978), and Plaintiff's claim for "excessive force at arrest" against both Deputies Redinger and Archer, Counts II and III, respectively. All of these counts are brought under 42 U.S.C. § 1983.

The facts recited by the Eleventh Circuit are appropriate to repeat in this context:

> We assume the parties are familiar with the facts of this case and summarize them only insofar as necessary to explain our decision. The facts below are described in the light most favorable to the plaintiff.
>
> Early morning on June 10, 2013, Baysa was playing cards at Derby Lane Poker Room in St. Petersburg, Florida. He claims that a security guard at Derby Lane was closely watching him. He testified that he exited the card room and walked into the parking lot, before returning and accusing the security guard of staring at him all night.
>
> The security guard escorted Baysa outside. He reentered, and the security guard again ordered him to leave. Baysa and the security guard argued with one another, as Baysa admits. Derby Lane staff called police to issue a trespass warning. Baysa admits that he was "told ... to stay away [and] go outside."
>
> Once in the parking lot, Baysa saw movement by his car, and feared he was being set up for a DUI. He called 911. On the call, audio of which is in the record, Baysa was noticeably agitated and argumentative. He stated that he felt in danger from the security guard and requested to be picked up and taken home. He told the dispatcher that a guard requested that he go home and stay away.
>
> The Deputies responded to Baysa's 911 call. Deputy Redinger spoke with the security guard, who stated that Baysa was "acting in a disorderly fashion" and that Derby Lane wanted to issue a trespass warning. The security guard repeated his trespass warning to Baysa in Deputy Redinger's presence. Baysa testified that Deputy Redinger restated the guard's trespass warning, but that Baysa argued against it.

2

Deputy Redinger then walked over and told him they were going to issue a trespass warning. Deputy Redinger ended the conversation by saying "Don't come back here anymore. You're free to go." According to Baysa's testimony at his criminal trial, Baysa began to walk away from Deputy Redinger. But after he had taken three or four steps, he was grabbed from behind and fell headfirst into the pavement. He testified that his neck became twisted and he next remembered being in Deputy Redinger's car with his hands in handcuffs.

During his deposition in this matter, Baysa further testified that while on the ground, he was punched and kicked all over his body before he lost consciousness, and that he had been put in a chokehold or headlock. Deputy Redinger testified that Baysa was "verbally ... aggressive" with Derby Lane personnel. He further stated that Baysa walked towards the security guard "in an aggressive stance, shoulders back, chest out, bowing his chest up and you can see clenched fists." Deputy Redinger "felt there was an immediate issue where [Baysa] might strike" the guard and stepped in to arrest Baysa.

Deputy Redinger further testified that he grabbed Baysa's wrists to restrain him, at which point Baysa pulled away. Deputy Redinger then pushed Baysa against the patrol car, but Baysa broke free again. Deputy Redinger effected a takedown by grabbing around Baysa's shoulders or neck.

Deputy Redinger and Baysa fell onto the pavement. Deputy Redinger testified that he used "palm heel strikes," or open hands where the "striking area is the heel of your palm[,] ... somewhere from [Baysa's] shoulder to waistline." Deputy Redinger used these to pull Baysa's hands free and handcuff him.

Baysa was arrested on misdemeanor counts of disorderly conduct in an establishment and resisting arrest without violence; the State's Attorney's Office amended the former charge to trespass. Baysa was acquitted of both counts.

*Baysa v. Gualtieri*, 786 F. App'x 941, 942–43 (11th Cir. 2019); Dkt. 88.

## I. The Court grants Archer's Motion

<u>There is No Competent Proof of Archer's Use of Excessive Force</u>

Stephanie Archer was a second deputy called to the scene. The Derby Lane incident happened June 10, 2013. Archer, who responded as back-up to a call at a location she had been before (Dkt. 43-10 at 5), did not take statements or write a report, did not talk to Plaintiff or take him into custody, nor have any involvement at all beyond the ten minutes or so event. Deputy Redinger testified that when he struggled with Plaintiff, Archer did not assist him. Dkt. 43-14 at 38. Archer retired in August 2013 after 25 years on the job, and at her deposition five years later she did not recall the details of the event. Dkt. 43-10 at 6. This is not surprising.

Plaintiff was deposed in this matter and plainly testified that he never saw Archer use force upon him and he does not know if she did. Dkt. 43-11 at 135. Plaintiff then was rehabilitated at the deposition by his lawyer and then testified that after reading the Derby Lane guard's incident report his recollection was refreshed. Answering his lawyer's leading question, Plaintiff testified that the report refreshed his recollection and he remembered "being thrown on the hood of the car by both deputies." Dkt. 43-11 at 144.

Plaintiff urges Archer's involvement is shown by this Derby Lane incident report, found at docket 48-1. Plaintiff asks the Court to consider this report as part

of the facts related to the summary judgment issues, and states the Court rightly should because the report is admissible at trial. Dkt. 97 at 4; Dkt. 100 at 2. Accepting Plaintiff's invitation, the Court attaches this report here as an appendix. The report conflicts in many material parts with Plaintiff's deposition. If the report stood alone and were credited, it defeats entirely Plaintiff's present claims. *See* Dkt. 48-1. As to Archer, the report states that when the drunk and disorderly Plaintiff was arrested for disorderly conduct by Officer Redinger, Plaintiff physically resisted being handcuffed, "causing Deputy C. Redinger and the 2nd responding PCSO Deputy [Archer] to forcibly place Mr. Baysa on the hood of Deputy C. Redinger's cruiser." Dkt. 48-1 at 3. The only other reference to Archer in this incident report was that Baysa continued to defy and physically resist arrest which caused Redinger to take Baysa to the ground and put him in a "headlock" while the Derby Lane security guard "assisted in getting Mr. Baysa [sic] hands behind his back so the 2nd PCSO Deputy [Archer] could place Mr. Baysa in handcuffs." Dkt. 48-1 at 3.

Contrary to Plaintiff's suggestion, this Derby Lane incident report does nothing to suggest liability by Archer. In fact the report refutes her liability entirely and shows she acted entirely appropriately to a drunk and disorderly man who was resisting lawful arrest. *See* appendix to this order.

The only evidence in this case showing Archer touched Plaintiff inappropriately is the lawyer-created interrogatory answer. Dkt. 48-5. This defense interrogatory asked Plaintiff to identify practices and policies that "were the direct and proximate cause of the unconstitutional use of excessive force" against Plaintiff. Dkt. 44-5. Plaintiff answered the interrogatory:

> Upon being told that I was free to go by Redinger, I turned towards my car. After taking several steps and without warning or being told I was under arrest, I was accosted, slammed on the cruiser, and then forcibly and violently face planted. Immediately after being taken to the asphalt ground face first, my head was pulled back and I was placed on a chokehold. Because of the chokehold, I became limp and knocked semi-unconscious. While in this state, my face was repeatedly force[d] into the ground in addition to simultaneous blows all over my body. After being wailed on for some time, I eventually passed out. I then woke up in the back of the police car with my hands cuffed behind my back, coughing up and spitting out blood.
>
> I contend that both Redinger and Archer had no right to treat me or anyone, the way in which I was treated on that early morning of June 10, 2013. I contend that the overly aggressive and deadly actions (i.e., slamming me on a patrol car and slamming me on asphalt ground, choking me, and beating on me) of the Deputies were the direct and proximate cause of the injuries I sustained that early morning and the permanent physical and mental injuries that I continue to deal with. Further I contend that each act of violence committed against me was a custom, policy or practice of the PCSO and Redinger and Archer simply employed what is customary and typical at the PCSO.

Dkts. 44-6; 48-5.

Plaintiff's interrogatory answer does not save the day for him and create a legitimate issue of fact as to Archer. First, it is ambiguous as to what Archer did. It does not state whether and how Stephanie Archer, herself, used unconstitutional

excessive force upon Plaintiff.  Second, the interrogatory answer is itself refuted by the Derby Lane incident report that Plaintiff offers.

The interrogatory answer is in effect a sworn statement or affidavit.  It conflicts materially with Plaintiff's deposition in this case, where he flatly testified that he could not say if Archer touched him (later to be refreshed by the incident report that she assisted in forcibly placing him on the cruiser hood when he resisted handcuffing).  In *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 656 (11th Cir. 1984), the Eleventh Circuit affirmed the lower court's finding that an affidavit that contradicted, without explanation, a clear and unequivocal deposition could be disregarded as a sham.

Here, Plaintiff clearly stated in deposition that he never saw Archer use force upon him and he does not know if she did.  Dkt. 43-11 at 135.  Later his lawyer refreshed his recollection with the incident report that said Archer helped put him on the hood of the car when he was resisting being handcuffed.  The interrogatory answer predated his deposition but it was no doubt written by the lawyer.  And it conflicts with his clear deposition testimony without explanation.  The interrogatory does not withstand the "sham affidavit" doctrine and create a triable fact issue as to Archer.

Moreover, even his "refreshed" testimony that Archer helped put him on the car hood fails to prevent summary judgment.  The incident report (here in the

7

appendix) upon which Plaintiff relies shows Deputy Archer did not use any force on Plaintiff other than *de minimis* force associated with assisting to apply handcuffs to a resisting arrestee. *See Nolin v. Isbell*, 207 F.3d 1253, 1257–58 (11th Cir. 2000) ("[T]he application of *de minimis* force, without more, will not support a claim for excessive force" and "will not defeat an officer's qualified immunity[.]"); s*ee also*, *e.g.*, *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (holding force used was *de minimis* where deputy "grabbed [the plaintiff] by the arm, forced him to the ground, placed him in handcuffs" and "held [him] to the ground for less than one minute before he helped [him] to his feet"); *Croom v. Balkwill*, 645 F.3d 1240, 1252 (11th Cir. 2011) (per curiam) (affirming summary judgment where deputy forced elderly plaintiff to the ground from a squatting position and held her there with a foot or knee in the back for up to ten minutes, and noting that "[e]ven if unnecessary, the force used . . . was *de minimus.*"); *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003) (reversing denial of qualified immunity where officer "force[d] [the plaintiff] down to the ground and plac[ed] him in handcuffs," which court held was *de minimis* force).

The record is clear that Deputy Redinger arrested Plaintiff. Plaintiff does not contend that Archer had a duty to intervene or supervise Redinger. As to Archer, when one considers Plaintiff's evidence, it is uncontested that any force Archer offered (if she applied any at all — Plaintiff waffles on this) was

8

"reasonably proportionate to the need for that force" given the nature of Plaintiff's drunken, belligerent resistance to a lawful arrest. *Galvez v. Bruce*, 552 F.3d 1238, 1243 (11th Cir. 2008). This case record shows no other evidence as to Archer. Archer's motion (Dkt. 45) is therefore granted.

## II. The Court Denies Redinger's Motion

The Court denies Redinger's renewed motion for summary judgment on Count II (Dkt. 43). Plaintiff's deposition here conflicts materially and severely with his sworn criminal trial testimony. Plaintiff's drunken rant on the taped 911 call shows an angry, somewhat paranoid, intoxicated person. The Eleventh Circuit has held these are matters for trial-based assessment. Plaintiff's deposition testimony suffices to establish a contested fact issue as to whether the force used by Redinger at Plaintiff's lawful arrest was unconstitutionally excessive.

**DONE AND ORDERED** at Tampa, Florida, on January 31, 2020.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record