UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MAT S. BAYSA,

    Plaintiff,

v.                                                 CASE NO. 8:17-cv-434-T-02SPF

CHARLES REDINGER,

    Defendant.
_____/

## ORDER ON REMAND

This matter comes before the Court upon remand from the U.S. Eleventh Circuit. *Baysa v. Redinger,* 851 F. App'x 175 (11th Cir. 2021). After issuance of the mandate the undersigned permitted the parties leave to supplement any record. Although Mr. Baysa filed a motion seeking an extension of time and requesting assistance in retrieving records from his prior counsel for that purpose, no supplement to the record was filed. Dkts. 129, 133.

In its order of remand, Dkt. 118, the Eleventh Circuit addressed the undersigned's order, Dkt. 106, denying Deputy Redinger's renewed motion for summary judgment. Dkts. 43, 95, 98. The Appeals Court remanded for a further explanation of that denial, specifically a discussion of the legal standards, Redinger's qualified immunity arguments, and a substantial analysis of whether Redinger's actions violated clearly established constitutional rights. 851 F. App'x

at 176–77.  The record on the appeal was truncated because Mr. Baysa failed to file an appellee's brief defending the ruling on appeal.  What remains in the case,[1] and the sole issue on remand, is the excessive force arrest claim (Count II, Dkt. 23 at 11) that Baysa brings against Deputy Redinger under 42 U.S.C. § 1983.

The subject at bar is Redinger's motion for summary judgment, Dkts. 43, 95, 98, including the qualified immunity issue.  In his own words, Deputy Redinger "appealed the denial of his motion for summary judgment based on his entitlement to qualified immunity."  No. 20-10824 (11th Cir.), Appellant's Brief at 19 (filed 7/12/2020), citing Dkt. 111.  The undersigned again denies Deputy Redinger's motion for summary judgment on the excessive force claim.  Qualified immunity does not afford him immunity from suit.

The facts recited by the Eleventh Circuit in the earlier appeal are appropriate to repeat in this context:

> We assume the parties are familiar with the facts of this case and summarize them only insofar as necessary to explain our decision. The facts below are described in the light most favorable to the plaintiff.
>
> Early morning on June 10, 2013, Baysa was playing cards at Derby Lane Poker Room in St. Petersburg, Florida. He claims that a security guard at Derby Lane was closely watching him. He testified that he

---

[1] The Eleventh Circuit has previously affirmed the finding that Baysa's arrest was supported by probable cause.  *Baysa v. Gualtieri,* 786 F. App'x 941, 945 (11th Cir. 2019).  State law torts as well as a "*Monell*" claim against the Sheriff (Count I), and an excessive force claim against Deputy Archer (Count III), have been disposed of or abandoned in previous litigation and are no longer present in the case.

exited the card room and walked into the parking lot, before returning and accusing the security guard of staring at him all night.

The security guard escorted Baysa outside. He reentered, and the security guard again ordered him to leave. Baysa and the security guard argued with one another, as Baysa admits. Derby Lane staff called police to issue a trespass warning. Baysa admits that he was "told ... to stay away [and] go outside."

Once in the parking lot, Baysa saw movement by his car, and feared he was being set up for a DUI. He called 911. On the call, audio of which is in the record, Baysa was noticeably agitated and argumentative. He stated that he felt in danger from the security guard and requested to be picked up and taken home. He told the dispatcher that a guard requested that he go home and stay away.

The Deputies responded to Baysa's 911 call. Deputy Redinger spoke with the security guard, who stated that Baysa was "acting in a disorderly fashion" and that Derby Lane wanted to issue a trespass warning. The security guard repeated his trespass warning to Baysa in Deputy Redinger's presence. Baysa testified that Deputy Redinger restated the guard's trespass warning, but that Baysa argued against it.

Deputy Redinger then walked over and told him they were going to issue a trespass warning. Deputy Redinger ended the conversation by saying "Don't come back here anymore. You're free to go." According to Baysa's testimony at his criminal trial, Baysa began to walk away from Deputy Redinger. But after he had taken three or four steps, he was grabbed from behind and fell headfirst into the pavement. He testified that his neck became twisted and he next remembered being in Deputy Redinger's car with his hands in handcuffs.

During his deposition in this matter, Baysa further testified that while on the ground, he was punched and kicked all over his body before he lost consciousness, and that he had been put in a chokehold or headlock.

Deputy Redinger testified that Baysa was "verbally ... aggressive" with Derby Lane personnel. He further stated that Baysa walked towards the security guard "in an aggressive stance, shoulders back, chest out, bowing his chest up and you can see clenched fists." Deputy Redinger

3

"felt there was an immediate issue where [Baysa] might strike" the guard and stepped in to arrest Baysa.

Deputy Redinger further testified that he grabbed Baysa's wrists to restrain him, at which point Baysa pulled away. Deputy Redinger then pushed Baysa against the patrol car, but Baysa broke free again. Deputy Redinger effected a takedown by grabbing around Baysa's shoulders or neck.

Deputy Redinger and Baysa fell onto the pavement. Deputy Redinger testified that he used "palm heel strikes," or open hands where the "striking area is the heel of your palm[,] ... somewhere from [Baysa's] shoulder to waistline." Deputy Redinger used these to pull Baysa's hands free and handcuff him.

Baysa was arrested on misdemeanor counts of disorderly conduct in an establishment and resisting arrest without violence; the State's Attorney's Office amended the former charge to trespass. Baysa was acquitted of both counts.

*Baysa v. Gualtieri*, 786 F. App'x at 942–43 (11th Cir. 2019); Dkt. 88.

**RECORD FACTS RELATED TO COUNT II:** In supplement to the apt summary from the Eleventh Circuit above, the following facts concerning Count II are in this record.

A. The Private Security Guard Report

The private security guard's report is in this record. Dkts. 106-2; 48-1 at 3. Previously, Baysa asked the Court to consider this report as part of the facts related to the summary judgment issues, and stated the Court rightly should because the report is admissible at trial. Dkt. 97 at 4; Dkt. 100 at 2. The report conflicts in many material parts with Baysa's deposition. If the report stood alone and were

4

credited, it defeats entirely Plaintiff's present claims. *See* Dkts. 106-2; 48-1. The report states that when the drunk and disorderly Plaintiff was arrested for disorderly conduct by Deputy Redinger, Plaintiff physically resisted being handcuffed, "causing Deputy C. Redinger and the 2nd responding PCSO Deputy to forcibly place Mr. Baysa on the hood of Deputy C. Redinger's cruiser." Dkts. 106-2; 48-1 at 3. This report further states that Baysa continued to defy and physically resist arrest which caused Redinger to take Baysa to the ground and put him in a "headlock" while the Derby Lane security guard "assisted in getting Mr. Baysa [sic] hands behind his back so the 2nd PCSO Deputy could place Mr. Baysa in handcuffs." Dkts. 106-2; 48-1 at 3.

  B.  Mr. Baysa's Interrogatory Answer

The defense interrogatory asked Mr. Baysa to identify practices and policies that "were the direct and proximate cause of the unconstitutional use of excessive force" against Plaintiff. Dkt. 44-5. Plaintiff answered the interrogatory:

> Upon being told that I was free to go by Redinger, I turned towards my car. After taking several steps and without warning or being told I was under arrest, I was accosted, slammed on the cruiser, and then forcibly and violently face planted. Immediately after being taken to the asphalt ground face first, my head was pulled back and I was placed on a chokehold. Because of the chokehold, I became limp and knocked semi-unconscious. While in this state, my face was repeatedly force[d] into the ground in addition to simultaneous blows all over my body. After being wailed on for some time, I eventually passed out. I then woke up in the back of the police car with my hands cuffed behind my back, coughing up and spitting out blood.

5

> I contend that both Redinger and Archer had no right to treat me or anyone, the way in which I was treated on that early morning of June 10, 2013. I contend that the overly aggressive and deadly actions (i.e., slamming me on a patrol car and slamming me on asphalt ground, choking me, and beating on me) of the Deputies were the direct and proximate cause of the injuries I sustained that early morning and the permanent physical and mental injuries that I continue to deal with. Further I contend that each act of violence committed against me was a custom, policy or practice of the PCSO and Redinger and Archer simply employed what is customary and typical at the PCSO.

Dkts. 44-6 at 3; 48-5 at 1.

   C. Mr. Baysa's Deposition Testimony

Mr. Baysa's deposition in this case can be found at Dkt. 43-11. He testified that he was grabbed from behind. His neck was twisted. *Id.* at 9-10. He recalled waking up in the back of the police car spitting out blood. *Id.* at 11. He testified that he felt unconscious when his neck got twisted, and "I was pretty much getting wailed on and I eventually passed out. Like I said, the next thing I remember, I woke up in the back of the cruiser spitting out blood." *Id.* at 12. This portion of Mr. Baysa's testimony was somewhat disjointed because initially the deposing lawyer was walking through Baysa's criminal trial testimony with him. *Id.*

A little later in his deposition Mr. Baysa testified that "I could feel punches and kicks all over that body. That's all I could feel. Then eventually I passed out." *Id.* at 13. He was "down" and "grasping for air."

Mr. Baysa testified that he raised his voice to the security guard, because the guard was following him, "birddogging him" and Baysa felt the guard might be

6

"trying to set me up and stuff like that." *Id.* at 26. The guard screamed profanities at Baysa. *Id.* at 27. Baysa called 911 to ask for help. *Id.* Baysa feared for his life from the security guards. *Id.* at 38.

When the deputies arrived, they asked for his identification. The security guard approached and "were like chuckling." *Id*. at 60. Then Redinger came over and told Baysa they were going to issue a trespass warning, and Mr. Baysa was trying to make a point or an argument. *Id.* at 58–61. Baysa then "asked him, I was like '[i]f you don't want to hear what I'm trying to say, am I free to go now?' He said, 'Yes.' But he reiterated 'Please don't come back here.' I said, 'Yes.'" *Id*. at 61. Redinger just said "[H]ere is your ID. Don't come back here anymore. You're free to go." *Id*. Baysa then took three or four steps and someone grabbed him, then he was down. *Id.* at 62. He recalled waking up in the patrol car spitting out blood and his face was bloody. *Id*. at 64. Deputy Redinger was in the patrol car with blood on his wrists. *Id*. He testified that the car was moving when he regained consciousness. *Id.* at 71. In the car Deputy Redinger "offered to let me go and forget everything. I said, 'No. Just take me to jail.'" *Id.* at 74–75.

Someone grabbed him from behind.[2] The security guards were not near him when he was attacked. Mr. Baysa testified that based on how his neck was, "that's

---

[2] Baysa testified at one point he did not see who grabbed him from behind. Dkt. 43 at 11–12 (citations). Redinger has conceded, and it is undisputed, that Redinger was the person grabbing Baysa. Dkt. 43 at 6.

7

got to be a chokehold." *Id*. at 139.  At the deposition he verified his interrogatories which claimed a chokehold was used upon him.  *Id.* at 139–140.  He testified this happened: "After I read Redinger's narrative, yes.  And that's probably what happened, that I was indeed put in a headlock or a chokehold, because I lost consciousness and there was a big bruise around my neck.  And when I was in jail, then going home and getting the Gatorade, like my Adam's apple was out of place.  It was hard for me to swallow…." *Id*. at 141.  Mr. Baysa agreed that this was an assumption.  *Id*. at 142.

At his deposition, Mr. Baysa's lawyer showed him the private security guard's report, and Baysa stated that his recollection was refreshed.  Answering his lawyer's leading question, Plaintiff testified that the report refreshed his recollection and he remembered "being thrown on the hood of the car by both deputies." *Id*. at 144.  And he remembered now being thrown "face plant" onto the cement.  *Id.*  He recalled being placed in a chokehold and having his neck twisted by Redinger.  *Id.* at 144–145.  And based on his reading all the information he recalled being punched on his body while he was on the ground semi-unconscious.  *Id.*  He had an independent recollection of not being able to breathe.  He did not resist the deputies' arrest.  *Id.*  He did not run from the deputies, rather he was informed he was free to go.  *Id.* at 146.

8

Mr. Baysa stated while being recrossed by defense counsel that after reading the security officer's report, he recalls he was placed in a chokehold.  Also his symptoms thereafter made him believe that.  His memory "brought me back that maybe the reason why I was feeling that is because I was being put in a chokehold."  *Id.* at 147.  The reports of the deputy and the security guard, as well as the marks on his neck and how he could not swallow "indicates that I was indeed choked."  *Id*. at 152.  "Why do I feel this way the day after or that same morning.  Why is it hard for me to swallow?  I could barely breathe sometimes."  *Id.* at 153.

Mr. Baysa also testified about his one hospital visit after the incident.  Those records show he was complaining of slash of forehead, neck, left rib, and right elbow pain.  *Id*. at 123.  The records state he said that "he was kicked and punched."  *Id.*  The records show a swollen face, basically a bad "black eye."  He had a fracture of the orbital that was not believed to be acute or needing intervention.  *Id.* at 123–24; *see* Dkt. 48-2 at 4 (noting "facial contusion, eye contusion, subconjunctival hemorrhage, elbow abrasion, abrasions of multiple sites, head, and rib contusion").  He received x-rays and CT scans which were negative except for nonacute orbital fracture.  The comment in the hospital record states that "He was leaving Derby Lane, Security and P.D. assaulted him upon

leaving the facility." Dkt. 43-11 at 123–25; Dkt. 48-2 at 12.  The subconjunctival hemorrhage was noted as "complete" with "obvious edema."  Dkt. 48-2 at 1.

   D.  Deputy Redinger's Testimony

Deputy Redinger's deposition is found at Dkt. 43-14.  He testified that he answered a trespass call from Derby Lane at about 2:46 am.  He encountered Mr. Baysa in the parking lot, and spoke to the security guard.  *Id.* at 27.  The guard stated that Baysa was acting in a disorderly fashion and they wanted to give him a trespass warning.  *Id*. at 28.  He testified the guard gave the warning to a belligerent Mr. Baysa.  *Id*. at 29.  Baysa refused a photograph that Derby Lane wished to take.  *Id.* at 29–31.  Baysa was pacing back and forth "and verbally be aggressive – just very very aggressive manner, very loud with profanities, really worked up over his being trespassed…."  *Id.*  Baysa appeared intoxicated.  Redinger testified he told Mr. Baysa to step away from the staff, and Baysa approached a staff person for a second time, in a more aggressive manner with clenched fists, bowing his chest up.  Redinger said at that point he raised his voice and told Baysa to step back, which he did.  But Baysa then reengaged and was more agitated "displaying the closed fists, that aggressive fighting stance that I've seen before in my last 15 years of experience way too many times."  *Id*. at 32.

Redinger felt there was "an imminent issue where he might strike [the security guard] now.  That's when I stepped in and tried to effect an arrest at that

10

point." *Id.* at 32. Mr. Baysa did not swing his fists or run at the security guard. *Id.* at 33. The deputy determined he should arrest Mr. Baysa for disorderly conduct. *Id.* at 35. This was the third time Mr. Baysa was approaching the security guard in an aggressive posture, and the deputy sought to restrain Baysa and "tried to pull his arms back behind him." *Id*. at 36. Mr. Baysa braced up, tensed up and tried to pull away. *Id.* The deputy sought to use the nearby car as a blocking mechanism so Mr. Baysa could not turn around and strike him. Redinger testified that Mr. Baysa tried to spin around while the deputy was trying to gain control of his wrists. Mr. Baysa got free from his control, and tried to spin around on him. *Id.* at 39. The deputy testified he then did "[a] very hurried takedown if you will." *Id.* They landed on the ground with Mr. Baysa blocking his fall with his hands. "My chest was pressing down against his shoulder blades," according to Deputy Redinger. *Id*. at 40. Mr. Baysa had been going basically face first toward the ground. *Id.* The ground was asphalt.

    The deputy said he was voicing commands to Mr. Baysa, who was making straining, grunting sounds. *Id.* at 41. The deputy said his biceps were riding across the left outer portion of Baysa's neck. The deputy denied having a restraint across the front of Baysa's neck. *Id.* at 40–42. "[W]hen we hit the ground. I know I had to hold on at that point, not quite for dear life, but I had to hold on for the ride so to speak at this juncture to maintain control." *Id.* at 42. Before the deputy put Mr.

Baysa against the car and to the ground, the deputy noted that Baysa had not kicked at or swung at the deputy or his colleague. *Id.* Nor did the deputy hear curse words directed at the deputies. While on the ground, to extricate his arm underneath Baysa, the deputy gave Baysa two palm heel strikes in the upper body. *Id.* at 43. They did not succeed in getting Redinger's arm free. *Id.* at 43. The deputy denied ever punching Mr. Baysa. With the assistance of either his colleague or the security guard, the deputy got Baysa's hands free to handcuff him.

The deputy did not believe Mr. Baysa's head came into contact with the car hood. *Id.* at 46. Mr. Baysa's hands and forehead hit the ground with the deputy on top of him. The deputy stated he did not recall placing his knee on Baysa's back to control him. *Id.* at 47. There was no chokehold or headlock. *Id.* at 47–48. [The denial of a headlock conflicts both with Baysa and with the private security guard report.] The deputy saw abrasions like "road rash" on Mr. Baysa. *Id.* at 49. He was responsive and had not lost consciousness. *Id*. There was little blood: "We fell like a sack of potatoes. We just went to the ground." *Id*. The deputy typed out charges on the computer in his cruiser, for disorderly conduct and resisting arrest without violence.

***LEGAL ANALYSIS:***   "To determine whether officers 'behaved reasonably in the light of the circumstances before [them],' courts must evaluate whether the force used was 'reasonably proportionate to the need for that force' by analyzing

'the severity of the crime, the danger to the officer, and the risk of flight.'" *Baysa v. Gualtieri,* 786 F. App'x at 946 (citing *Galvez v. Bruce,* 552 F.3d 1238, 1343 (11th Cir. 2008)). In other words, the court must weigh the "nature and quality" of the intrusion on the individuals Fourth Amendment interests against the countervailing government interest at stake. *Graham v. Connor,* 490 U.S. 386, 396 (1989). One must consider the reasonableness of the force used from the perspective of a "reasonable officer on the scene." *Id.* An objective test is used; one does not consider an individual officer's intent or motivation. *Id.* at 397. This inquiry must be undertaken with the understanding of the dynamic, split-second decisions facing police officers in often dangerous conditions. Because "government officials are not required to err on the side of caution, qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." *Lee v. Ferraro,* 284 F.3d 1188, 1200 (11th Cir. 2002) (citations omitted).

In addressing this issue in a summary judgment context, the facts and the inferences from them must be cast in a light most favorable to the plaintiff non-movant. *Scott v. United States,* 825 F.3d 1275, 1278 (11th Cir. 2016); *Swint v. City of Wadley, Ala.,* 51 F.3d 988, 992 (11th Cir. 1995). "[W]here there are 'varying accounts of what happened,' the proper standard requires us to adopt the

account most favorable to the non-movant[]." *Smith v. LePage,* 834 F.3d 1285, 1296 (11th Cir. 2016).

The Court may not adjudge credibility of Baysa at this point. As to Baysa's contradictory testimony, the Eleventh Circuit has cautioned in this very case "weighing contradictory statements along with explanations for those contradictions are judgments of credibility. Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment." 786 F. App'x at 946. The Eleventh Circuit has ruled at this stage that "inconsistencies between Baysa's [criminal] trial testimony and his deposition testimony are 'more appropriately considered "variations of testimony" or "instances of failure memory" going to the weight and credibility of the evidence as opposed to falsehoods rendering the [deposition testimony] a disregardable sham.'" *Id.*, (citing *Croom v. Balkwill,* 645 F.3d 1240, 1253 n. 18 (11th Cir. 2011)).

"Summary judgment is appropriate if the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *McCullough v. Antolini,* 559 F.3d 1201, 1204 (11th Cir. 2009) (internal quotation marks omitted).

Concerning qualified immunity, it is an affirmative defense stemming from the Supreme Court case of *Harlow v. Fitzgerald,* 457 U.S. 800, 815 (1982). *See*

14

*also Gomez v. Toledo,* 446 U.S. 635, 640 (1980). The doctrine applies to a governmental official acting within the scope of his discretionary authority. If that is met, the doctrine asks: 1) Has Plaintiff asserted a violation of a federal constitutional or statutory right?; and 2) If so, was that right clearly established at the time of the challenged conduct? In the Eleventh Circuit, once the issue is raised the burden shifts to the Plaintiff to show that the right Plaintiff seeks to vindicate was clearly established. *Hope v. Pelzer,* 536 U.S. 730, 736 (2002); *Singletary v. Vargas,* 804 F.3d 1174, 1180 (11th Cir. 2015).

There is no dispute that Deputy Redinger was a public officer, acting within his discretionary authority. *Gray ex. rel. Alexander v. Bostic,* 458 F.3d 1295, 1303 (11th Cir. 2006). Whether and how to arrest the drunk and disputatious Mr. Baysa at 3:00 a.m. at Derby Lane was committed to Redinger's discretion. And plainly Baysa has alleged that his Fourth Amendment rights include freedom from an excessive force arrest.

The facts recited above by the Eleventh Circuit earlier in this case, and Baysa's deposition and interrogatories here, require denial of Deputy Redinger's motion. If one credits Baysa's testimony, he was unthreatening and unresisting. The deputy had a colleague present and at least two private security guards, and the offense was minor. According to Baysa, Baysa was gratuitously attacked from behind, beaten ("wailed upon"), "face planted," and choked to unconsciousness by

Deputy Redinger *after* Deputy Redinger told Baysa he was free to leave and Baysa turned and had taken several steps in departing.

Baysa's right to be free from such a gratuitous assault as he has described is within clearly established Fourth Amendment law.  Baysa may establish such by "showing that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official."  *Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir. 1997).  On Baysa's facts, his right to be free from gratuitous attack on these circumstances is very clear.  If Baysa is credited, Redinger's conduct "was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point."  *Priester v. City of Riviera Beach, Fla.,* 208 F.3d 919, 926 (11th Cir. 2000) (citation omitted); *Oliver v. Fiorino,* 586 F.3d 898, 907 (11th Cir. 2009).

Deputy Redinger cites a number of cases, arguing that he used "*de minimis*" force on Baysa.  Dkt. 43 at 20–22; Dkt. 95 at 4–9.  Baysa suffered abrasions on his face and body from being tackled on asphalt, bruised neck and body parts, subconjunctival hemorrhage, a fairly bad "black eye," and a non-acute orbital fracture.  Dkt. 48-2 at 4.

Although the Court has reviewed the *de minimis* force cases, Redinger begs the question here.  Baysa testified he was not resisting, and was turned and

16

departing, attacked from the rear, after Redinger told him he was "free to go." The Eleventh Circuit noted these facts. 786 F. App'x at 942–43; Dkt. 88. Redinger has elided these facts throughout but they are plainly in this record and must be considered in a light favorable to Baysa. These are the facts we must accept at this stage and they distinguish Redinger's cited cases. Any officer who informs a subject he is free to go, and the subject begins departing peaceably under those words, would know that accosting the departing subject in this manner is unlawful. Baysa has alleged an entirely gratuitous attack on a non-resisting subject who was told he may depart by the officer and was doing so peaceably.

"[T]he application of *de minimis* force, without more, will not support a claim for excessive force" and "will not defeat an officer's qualified immunity[.]" *Nolin v. Isbell,* 207 F.3d 1253, 1257 (11th Cir. 2000); *see also*, *e.g.*, *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (holding force used was *de minimis* where deputy "grabbed [the plaintiff] by the arm, forced him to the ground, placed him in handcuffs" and "held [him] to the ground for less than one minute before he helped [him] to his feet"); *Croom*, 645 F.3d at 1252 (affirming summary judgment where deputy forced elderly plaintiff to the ground from a squatting position and held her there with a foot or knee in the back for up to ten minutes, and noting that "[e]ven if unnecessary, the force used . . . was *de minimis*."); *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003) (reversing

17

denial of qualified immunity where officer "force[d] [the plaintiff] down to the ground and plac[ed] him in handcuffs," which court held was *de minimis* force). Redinger cites a number of severe injury cases where the force was *de minimis*. Typically in each of these cases the court determined that the use of force was reasonably proportionate to the need, given the nature of the circumstances presented, or the force was itself minimal. *E.g.*, *Galvez*, 552 F.3d at 1243. Baysa's testimony is different. Under his version of the facts the encounter had ended; there was no need for any force whatsoever. Redinger's motion for summary judgment on qualified immunity is denied.

      **DONE AND ORDERED** at Tampa, Florida, on October 15, 2021.

      */s/ William F. Jung*
      **WILLIAM F. JUNG**
      **UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record via CM/ECF
Mat Baysa, via first class mail